**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Arnel Dasrath, as Administrator of the Estate
of Rexford Dasrath,

        Plaintiff,

      -against-

The City of New York, Police Officer Nicholas
Guzman, in his individual capacity, Police
Officer Kevin Ermann, in his individual
capacity,

        Defendants.

Civil Action No. 15-cv-00766-AMD-RLM


# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
# FOR SUMMARY JUDGMENT


Dated:  November 17, 2017

O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................. 4

ARGUMENT ................................................................................................ 9

    I.    Summary Judgment As To The Excessive Force And Assault And Battery Claims Must Be Denied ............................................................................. 9

        A.    It Was Not Objectively Reasonable To Shoot Rexford Dasrath Five Times ...................................................................................... 10

        B.    The Degree Of Force Used Was Not Objectively Reasonable ............... 13

        C.    The Assault and Battery Claims Survive Summary Judgment ............... 15

    II.    Disputed Issues Of Material Fact Bar Summary Judgment On Qualified Immunity Grounds ............................................................................... 15

    III.    The Negligence Claim Cannot Be Resolved On Summary Judgment ............... 16

    IV.    The Wrongful Death Action Cannot Be Resolved On Summary Judgment ....... 21

    V.    Defendants Are Not Entitled To Governmental Immunity................................ 22

    VI.    This Court Should Retain Jurisdiction Over The State Law Claims Even If The Court Dismisses The Excessive Force Claim ............................................... 24

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alvarez v. City of New York*,
2017 WL 1506563 (S.D.N.Y. Apr. 27, 2017) ........................................................................ 14

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................................... 9

*Benson v. Yaeger*, 2009 WL 1584324, at *10 (W.D.N.Y. June 3, 2009) ..................................... 15

*Biggs v. City of New York*,
2010 U.S. Dist. LEXIS 121332 (S.D.N.Y. Nov. 15, 2010)..................................................... 13

*Brown v. City of New York*,
798 F.3d 94 (2d Cir. 2015) ...................................................................................................... 10

*Carbocci v. Lake Grove Entm't, LLC*,
883 N.Y.S.2d 113 (2009).......................................................................................................... 20

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988).................................................................................................................. 24

*Cerbelli v. City of New York*,
2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sep. 8, 2008)................................................... 15, 16

*Chamberlain v. City of White Plains*,
986 F. Supp. 2d 363 (S.D.N.Y. 2013) ................................................................................ 14, 15

*Charles v. Cty. of Nassau*,
116 F. Supp. 3d 107 (E.D.N.Y. 2015) ....................................................................................... 9

*Chen v. City of Syracuse*,
2009 WL 529553 (N.D.N.Y. Mar. 2, 2009) ............................................................................ 15

*Chong v. New York City Transit Auth.*,
83 A.D.2d 546 (1981) ............................................................................................................... 21

*Etienne v. New York City Police Dept.*,
37 A.D.3d 647 (2d Dept. 2007) ............................................................................................... 20

*Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp.*,
427 F.2d 399 (2d Cir. 1970) .................................................................................................... 24

*Graham v. City of New York*,
136 A.D.3d 747 (2d Dept. 2016) ............................................................................................. 20

*Graham v. Connor*,
490 U.S. 386, 394 (1989).......................................................................................................... 10

*Haddock v. City of New York*,
75 N.Y.2d 478 (1990)............................................................................................................... 23

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Moran Towing Corp.*,
  984 F. Supp. 2d 150 (S.D.N.Y. 2013), *amended by*, 996 F. Supp. 2d 221 (S.D.N.Y. 2014) ... 22

*Jackson v. City of Rochester*,
  705 F. Supp. 779 (W.D.N.Y. Jan. 31, 1989)............................................................ 13

*Johnson v. City of New York*,
  15 N.Y.2d 676 (2010) ............................................................................................ 24

*Kwong v. Bloomberg*,
  723 F.3d 160 (2d Cir. 2013) .................................................................................... 9

*Lubecki v. City of New York*,
  758 N.Y.S.2d 610 (1st Dep't 2003) .......................................................................... 17

*McCummings v. New York City Transit Auth.*,
  81 N.Y.2d 923 (1993) ............................................................................................ 17

*Nash v. Cahill*,
  1996 U.S. Dist. LEXIS 10292 (S.D.N.Y. Jul. 19, 1996) .................................... 10, 13

*Negron v. City of New York*,
  976 F.Supp.2d 360 (E.D.N.Y. 2013) .................................................................. 20, 22

*O'Bert v. Vargo*,
  331 F.3d 29 (2d Cir. 2003) ............................................................... 10, 12, 15, 16

*Okin v. Village of Cornwall-On-Hudson Police Dept.*,
  577 F.3d 415 (2009).............................................................................................. 15

*Pierre-Antoine v. City of New York*,
  2006 WL 1292076 (S.D.N.Y. May 9, 2006) ...................................................... 9, 14

*Pinckert v. Trucklease Corp.*,
  2006 WL 903176 (S.D.N.Y. 2006).......................................................................... 22

*Pinto v. Allstate Ins. Co.*,
  221 F.3d 394 (2d Cir. 2000) .................................................................................... 9

*Raucci v. Rotterdam*,
  902 F.2d 1050 (2d Cir. 1990) ................................................................................ 24

*Read v. Town of Suffern Police Dept.*,
  2013 WL 3193413 (S.D.N.Y. June 25, 2013) .................................................. 14, 16

*Reddington v. Staten Island Univ. Hosp.*,
  511 F.3d 126 (2d Cir. 2007) .................................................................................. 24

*Routier v. O'Hara*,
  2013 U.S. Dist. LEXIS 99947 (E.D.N.Y. Jul. 16, 2013)........................................ 13

*Scott v. Henrich*,
  39 F.3d 912 (9th Cir. 1994) .............................................................................. 10, 16

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Smith v. City of New York*,
  2015 WL 4643125 (S.D.N.Y. Aug. 5, 2015) .......................................................... 17

*Stevens v. Metro. Transp. Auth. Police*,
  293 F. Supp. 2d 415 (S.D.N.Y. Dec. 3, 2003) ...................................................... 13

*Sullivan v. Gagnier*,
  225 F.3d 161 (2d Cir. 2000) .................................................................................. 13

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014) .......................................................................................... 11

*Tolbert v. Smith*,
  790 F.3d 427 (2d Cir. 2015) .................................................................................... 9

*Trimble v. City of Albany*,
  133 A.D.3d 1484 (3rd Dept. 2016) ........................................................................ 23

*Valdez v. City of New York*,
  18 N.Y.2d 69 (2011) .............................................................................................. 23

*Werra v. Cassedy*,
  243 N.Y.S. 545 (1930) ........................................................................................... 22

*Whitfield v. City of Newburgh*,
  2015 WL 927695 (S.D.N.Y. Dec. 17, 2015) ........................................................... 9

*Williams v. Utica Coll. of Syracuse Univ.*,
  453 F.3d 112 (2d Cir. 2006) ............................................................................. 16, 17

*Wilson v. Roberson*,
  1996 WL 63053 (S.D.N.Y. Feb. 14, 1996) ............................................................ 20

**Statutes**

N.Y. Est. Powers & Trusts Law § 4-1.1 .................................................................... 24

N.Y. Est. Powers & Trusts Law § 5-4.1 .................................................................... 23

N.Y. Est. Powers & Trusts Law § 5-4.3 .................................................................... 24

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 9

Local Rule 56.1 ............................................................................................................ 4

## PRELIMINARY STATEMENT

Summary judgment is inappropriate where there is a genuine dispute as to *any* material fact.  As this Court correctly identified, this case "boil[s] down to factual disputes *about everything*."  Transcript of Pre-Motion Conference at 3:1–2.  Accordingly, Defendants' summary judgment motion should be denied.

Even the most basic facts of the incident in which rookie NYPD Officers Nicholas Guzman and Kevin Ermann ("Defendant Officers") took the life of decedent Rexford Dasrath are up for debate.  The parties agree on only a very rough sketch of what transpired:  Rexford Dasrath was an emotionally disturbed 22 year-old male.  On November 18, 2013, the Defendant Officers were dispatched to 902 Hart Street to investigate a "10-39"—harassment over the phone.  At some point after Defendant Officers arrived at 902 Hart Street, Rexford moved towards their police vehicle.  Defendant Officers pulled their car forward and spoke with Pedro Maldonado, a livery cab driver.  Defendant Officers drove away and turned the corner, leaving Rexford out of sight.  Defendant Officers exited their vehicle and approached Rexford with their guns drawn and yelling at him, after which Officer Guzman shot Rexford five times.  Rexford was transported to Woodhull Hospital and pronounced dead.

Everything else is either in dispute, omitted entirely from Defendants' brief, or both:

***There are key, material facts in dispute***:  The parties disagree on two critical interactions that supposedly support the officers' conclusion that Rexford was a threat:  (i) the officers contend (in self-serving testimony that legally need not be credited on this motion) that when they first arrived Rexford ran at their car while yelling and brandishing a knife—whereas a neutral fact witness, Maldonado, testified that Rexford walked to the car and that he did not see Rexford holding a knife; and (ii) the officers and Maldonado disagree on whether Maldonado informed the officers that Rexford was emotionally disturbed (rendering their subsequent actions

1

contrary to NYPD procedure) or warned them that Rexford was threatening civilians (which Maldonado denies).  There is also a critical fact question as to the distance between Officer Guzman and Rexford when the first shot was fired, with varying witness accounts putting the distance as far as *30 feet* when Guzman pulled the trigger.  And many other key, material facts are in dispute, including:  (i) whether any members of the general public were even at the scene of the shooting—let alone threatened; (ii) whether Rexford ever even spoke to the Defendant Officers; (iii) the size of the knife's blade; and (iv) whether Rexford was *falling* forward while Officer Guzman shot him.

**The undisputed facts favorable to Plaintiff were omitted by Defendants**:  In addition to glossing over the highly-relevant disputes discussed above, Defendants omit from their brief undisputed facts that favor Plaintiff, which legally must be considered.  These facts include that: (i) the NYPD had previously identified Rexford as an Emotionally Disturbed Person ("EDP"); (ii) the NYPD trains officers on excessive force and situations involving EDPs, but contrary to their training the officers never considered using lesser force (i.e., a taser or OC spray) or whether Rexford was an EDP (this despite their admitted belief that his behavior was "erratic" and "not rational"); (iii) the NYPD Investigations Unit criticized the Defendant Officers' conduct and tactics; (iv) no member of the public expressed fear of Rexford; (v) Defendant Officers had no idea whether Rexford was involved in the reported telephonic harassment; (vi) Defendant Officers expressed the lowest-possible level of urgency in their request for backup and did not wait for backup before confronting Rexford with guns drawn; (vii) Officer Guzman saw Rexford grimace after the first shot and saw Rexford pull his hand to his chest after the fourth shot, but Officer Guzman did not reevaluate before firing more rounds.

Consequently, Defendants are not entitled to summary judgment on any of Plaintiffs' claims:

- **Excessive Force, Assault and Battery, and Qualified Immunity**:  To win on excessive force as a matter of law, Defendants must show that there are *no material questions of fact* as to whether Officer Guzman's use of deadly force was objectively reasonable.  This reasonableness test also applies to both the assault and battery claim under New York law and the Defendants' qualified immunity defense.  Viewing the evidence in the light most favorable to Plaintiff, the use of force was *not* reasonable:  Rexford—an obese, plodding 350 pound man was up to 30 feet away when the first shot was fired, no one had expressed concern to the Officers about him, and (according to Mr. Maldonado) Rexford had not threatened the Officers prior to the Officers drawing their guns.  Moreover, even if some force was appropriate, the evidence indicates that Officer Guzman's decision to shoot Rexford *five times* without ever reevaluating the situation—despite perceiving Rexford grimaced and clutched his chest between shots—was not objectively reasonable.

- **Negligence**:  Both federal and New York appellate courts agree that negligence questions should generally be decided by a jury.  Here, Defendant Officers' negligent behavior leading up to the shooting—failing to identify Rexford as an EDP (despite being told he was), violating the requisite zone of safety, drawing firearms against NYPD guidelines, and unnecessarily forcing a confrontation with an EDP—fell well below the requisite standard of care, a standard established by the NYPD's own guidelines and procedures, and proximately caused the harm.  This negligent conduct is distinct from the wrongful intentional conduct on which the excessive force claim is based, and thus, contrary to Defendants' argument, both claims can be sustained.

- **Wrongful Death**:  Rexford's father Arnel Dasrath was duly appointed as Rexford's representative and suffered compensable pecuniary losses (funeral costs).  Because, as established above, there is a genuine issue of material fact as to whether Defendant Officers' wrongful or negligent conduct caused Rexford's death, this claim must also survive.

Defendants also claim that they are entitled to summary judgment on the state law claims on governmental immunity and jurisdictional grounds.  Both arguments fail.  Defendants are not entitled to governmental immunity because:  (i) they cannot show that Defendant Officers' careless behavior in engaging with Rexford flowed from discretionary decision-making, as no such decisions were made—they simply failed to properly consider the situation and their available options, and (ii) Defendant Officers did not (but should have) complied with the NYPD's own written guidelines.  As for the jurisdictional argument, even if the Court dismisses the federal excessive force claim, it should retain jurisdiction over the remaining state law claims to ensure that judicial and party resources are not wasted and that Mr. Dasrath has a fair opportunity to seek justice and restitution for the death of his son.

3

It is exactly four years to the day since Rexford Dasrath was killed by the NYPD. Whether that killing was wrongful and negligent cannot be decided on these papers. It is time for Rexford to get his day in court. Because issues of material fact abound as to all of Plaintiff's claims, the Court should deny Defendants' motion for summary judgment.

## **STATEMENT OF FACTS**

On November 18, 2013, at around 2:55pm, rookie NYPD Officers Guzman and Ermann were nearing the end of their almost-nine-hour tour patrolling Brooklyn's 83rd Precinct in a marked patrol car. SOUF ¶ 6.[1] Defendant Officers were at that time dispatched to answer a radio call in response to a "10-39"—an incident of harassment over the phone—at 902 Hart Street. *Id.* at ¶¶ 10–11, 13. Defendant Officers were not given, and did not request, any specific information about the 10-39 other than the 902 Hart Street address. *Id.* at ¶ 11.

When the Defendant Officers arrived at around 3:00 pm, Rexford Dasrath was outside 902 Hart Street, the apartment building where he lived with his mother. Counterstatement ¶¶ 15–16. Rexford was 22 years old and in poor health—he was five feet eight inches tall, but weighed 355 pounds and was classified as obese. *Id.* at ¶¶ 8-9. He was also emotionally disturbed. *Id.* Rexford was unable to hold a job due to his mental illness. SOUF ¶ 8.

Rexford approached the marked patrol car, and remained briefly beside it before Defendant Officers pulled away. Counterstatement ¶¶ 18–21. The nature of that encounter is hotly disputed—according to Defendants, Rexford "suddenly charged at the patrol car," while

---

[1] All references to "SOUF" refer to the numbered paragraphs in Defendants' Statement of Undisputed Facts; "Counterstatement" refers to Plaintiff's responses to the SOUF's numbered paragraphs, as set forth in Plaintiff's Rule 56.1 Counterstatement to Defendants' SOUF. "Memo." refers to Defendants' October 16, 2017 Memorandum of Law in support of their Motion for Summary Judgment. Any references to "Ex." or "Exhibit" refer to the Exhibits to the Nagle Declaration filed herewith. References to "Defs Ex." are to the Sundaran Declaration in Support of Defendants' Motion for Summary Judgment. Unless otherwise indicated, all emphasis is added and all internal quotation marks and citations omitted.

"holding a knife" with his arm "in a raised position," (Memo. at 4) but eyewitness Pedro Maldonado saw Rexford simply walk up to the car and remain beside it for a few seconds before the officers drove further down the block (Counterstatement ¶¶ 18–21). Maldonado did not see Rexford raise his arm and never saw him holding a knife. *Id.*

Maldonado then pulled his car alongside the patrol car and, in a conversation that Defendants neglect to fully describe in their brief, let the officers know that he was familiar with Rexford and that Rexford "had a little mental problem." Counterstatement ¶ 29. Contrary to Defendants' assertions, Maldonado testified that he did *not* say or do anything to indicate to the officers that Rexford had been behaving in a threatening or dangerous manner. *Id*. ¶¶ 28–29. In fact, Maldonado—who also lived in 902 Hart Street and had walked directly past Rexford when exiting the building just moments earlier—had not seen Rexford threaten anyone, with or without a weapon. *Id.* Indeed, the NYPD was unable to locate a single witness who felt threatened by Rexford in any way, or saw him threaten any civilian. *Id*. ¶ 23.

In an odd act, Rexford apparently threw a drinking glass in the general direction of the patrol car and Maldonado's car. Counterstatement ¶ 27. Defendant Officers then proceeded to turn left onto Irving Avenue and parked their patrol car about halfway down the block. SOUF ¶ 31. At this point, Defendant Officers were nearly a full block away from Rexford, around a corner, and out of sight. Counterstatement ¶ 34. Despite having put substantial distance between themselves and Rexford, Defendant Officers did not use this opportunity to reassess the situation. *Id*. ¶ 35. Instead, Defendant Officers immediately drew their guns when exiting the patrol car, having already agreed—without any discussion—that this was "a guns-out situation." *Id*. ¶¶ 35–36.

Defendant Officers were equipped that day with both OC spray and expandable batons, but *never even considered* using those nonlethal alternatives instead of their guns. Memo at 5

5

(noting that the Officers "did not consider" using nonlethal tactics).  Most glaring—and omitted entirely from Defendants' brief—is Defendant Officers' failure, at any point, to consider whether to follow the NYPD procedures for dealing with Emotionally Disturbed Persons ("EDPs"). Counterstatement ¶ 19.  It is undisputed that *Rexford Dasrath was an EDP*.  SOUF ¶ 8.  It is likewise undisputed (although, again, ignored in Defendants' brief) that Officer Guzman perceived Rexford's behavior as "not rational" and Officer Ermann believed it "erratic." Counterstatement ¶ 26.  And witness Pedro Maldonado testified that he told the officers that Rexford had a "mental problem."  *Id*. ¶ 34.  Defendant Officers nevertheless claim that they never once considered whether Rexford might be an EDP, and certainly did not stop to assess his behavior as they were trained to do and as is mandated by NYPD guidelines.  *Id*. ¶¶ 26, 29, 35, 37, 40.

Defendant Officers should have identified Rexford as an EDP.  And, they should have followed the corresponding procedures laid out in the NYPD Patrol Guide and Student's Guide, which includes alerting dispatch to the situation, calling for a supervisor, and requesting an ambulance or the Emergency Services Unit to assist in taking Rexford safely into custody.  *Id*. ¶¶ 26, 29, 35–40.  Had they followed the proper procedures, the officers also would have had to maintain a perimeter around Rexford, containing rather than confronting him.  *Id*. ¶ 36, 39.

Instead, Defendant Officers immediately drew their guns and advanced.  *Id*. ¶ 37.  They kept their weapons out even when they turned the corner back onto Hart Street and saw Rexford sitting on the stoop in front of 902 Hart Street with no knife in sight.  *Id*. ¶ 40.  Defendant Officers claim that Rexford was at that time still an imminent threat to them, though they were over half a block away, and to the general public, despite the fact that there were no pedestrians in the immediate area.  *Id*. ¶ 34.  And, inconsistent with Defendant Officers current version of events, they radioed in a request for only one additional unit to assist them, and—a detail

6

Defendants ignore—expressed the *lowest-possible* level of urgency in that request.[2]  *Id.* ¶¶ 37–38.  Defendant Officers then chose not to wait for even this minimum backup to arrive, and elected to confront Rexford rather than taking the precautions mandated by police protocol.  *Id.*

The officers rapidly advanced on Rexford with their guns up and began yelling commands at him—the opposite of what the NYPD guides instruct.  *Id.* ¶¶ 39–42, 45, 47–49.  Rexford stood and came down the steps, standing on the sidewalk as the officers approached within *a disputed range of anywhere from ten to thirty feet.  Id.* ¶¶ 52–53; Defs. Ex. O.  Officer Guzman advanced on the sidewalk without cover, then raised his weapon and pointed it at Rexford—tactical errors that violated police guidelines.  Counterstatement ¶ 36, 39; SOUF ¶¶ 43, 47.  Officer Ermann advanced in the street behind a row of parked cars.  SOUF ¶ 43.  Both officers continued shouting commands at Rexford.  Counterstatement ¶¶ 45, 47-49.

Just as the NYPD's guidelines anticipated, Defendant Officers' conduct agitated Rexford.  *Id.* ¶ 39.  As Defendant Officers continued to yell at him, Rexford screamed unintelligibly and moved down the sidewalk toward Officer Guzman, allegedly holding a knife.[3]  *Id.* ¶¶ 51–53;  SOUF ¶¶ 55, 57.  Guzman backpedaled to maintain the distance between himself and Rexford, and then fired one shot from *at least* ten feet away.  Counterstatement ¶¶ 52, 53, 59; SOUF ¶ 54.  The first shot struck Rexford in the torso, and Officer Guzman saw Rexford grimace in pain.  SOUF ¶ 61; Counterstatement ¶ 62.  When Rexford did not *immediately* stop all forward

---

[2] Defendants also do not mention that this decision was criticized by the NYPD Investigations Unit tasked with evaluating Defendant Officers' conduct and tactics.  Counterstatement ¶¶ 37–38.  That unit's Final Report found that "advising central of the emerging circumstances and requesting a 10-85 forthwith with the Emergency Service Unit would have given the officers further resources and backup necessary to help with this encounter."  *Id.*

[3] Guzman claimed for the first time at his deposition—three and a half years after the shooting— that at this point Rexford said, "You want to fight?"  This contradicts not only Officer Ermann's description of Rexford's behavior, but also *Guzman's own previous statements*, including statements given immediately after the shooting.  Counterstatement ¶ 51.

momentum after this first shot, Guzman made the decision to fire four more times, or until Rexford was dead.  Counterstatement ¶¶ 65–66; Memo. at 6-7.  And Guzman did almost instantaneously fire the next four shots in succession with no pause or reassessment of the situation.  Counterstatement ¶¶ 65–66.  This is despite Officer Guzman observing Rexford lower the hand holding the knife and clutch his chest after the fourth shot; he simply dismissed that and continued to fire.  Counterstatement ¶¶ 65–66; SOUF ¶ 67.  Officer Guzman also ignored that Rexford may have already been falling after the first shot—Medical Examiner Kathleen McCubbin testified that all of Rexford's bullet wounds had trajectories that were consistent with Rexford leaning or falling forward.  Counterstatement ¶¶ 65, 68.  Rexford was shot five times in total, suffering gunshot wounds to the upper right chest, right flank, abdomen, and left clavicular region, as well as the left hand.  *Id*. ¶ 65.  When Rexford hit the ground, his momentum had carried him no closer than between three *and fifteen feet* from Officer Guzman.  *Id.* ¶ 72; Defs. Ex. N.

Officer Ermann radioed that shots had been fired, and then approached and trained his weapon on Rexford, who Ermann remarkably still considered an imminent threat even while Rexford was lying prone on the sidewalk having been shot five times.  Counterstatement ¶¶ 34, 73, 76.  According to Defendants, the knife was still in Rexford's hand, and Officer Guzman stepped on the blade and pulled it away with no resistance from Rexford.  *Id*. ¶ 74.  The knife that the NYPD recovered from the scene was a small knife with a blade no more than three inches long (Defendants' claim that it was 5-7 inches long is directly refuted by NYPD photographic evidence.  *See* Ex. 8, DEF 599-601).  Counterstatement ¶¶ 16–17.  Ermann handcuffed Rexford, and Defendant Officers left him lying on the sidewalk bleeding until EMS arrived.  *Id*. ¶¶ 73–80.  Rexford was transported by ambulance to Woodhull Hospital, where he was pronounced dead at approximately 3:45 p.m.  *Id*. ¶¶ 80–82.

On February 13, 2014, Rexford's father, Arnel Dasrath, filed a Notice of Claim with the City of New York, and brought suit on February 13, 2015.  *Id.* ¶ 83–84.

## ARGUMENT

Summary judgment is proper "only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to *any* material fact[.]"[4]  A "genuine" issue of material fact exists where—after "resolving all ambiguities and drawing all inferences in favor of the non-moving party"[5]—there is "sufficient evidence on which the jury could reasonably find for the plaintiff."[6]  Here, significant factual issues are in dispute or weigh heavily in Plaintiff's favor.  The Court should therefore deny summary judgment as to all claims.

## I.   SUMMARY JUDGMENT AS TO THE EXCESSIVE FORCE AND ASSAULT AND BATTERY CLAIMS MUST BE DENIED

Disputed material facts bar summary judgment as to Plaintiff's first and fourth causes of action for:  (i) excessive force under the Fourth Amendment and (ii) assault and battery.  The question before the Court is the same for both causes of action:  Was Officer Guzman's use of force objectively reasonable?[7]  Viewing the evidence in the light most favorable to Plaintiff, as the Court must, the answer to this question is clear:  It was *not* objectively reasonable for Officer Guzman to shoot Rexford five times.  Because there is at best a factual dispute as to these claims, the Court should deny summary judgment.

---

[4] *Charles v. Cnty. of Nassau*, 116 F. Supp. 3d 107, 116 (E.D.N.Y. 2015); *see also* Fed. R. Civ. P. 56(a); *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015; *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013).
[5] *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).
[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[7] *See Whitfield v. City of Newburgh*, 2015 WL 927695, at *7-8 (S.D.N.Y. Dec. 17, 2015) (holding an officer's force is excessive where force used was objectively unreasonable); *Pierre-Antoine v. City of New York*, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) ("[T]he test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim.").

### A.     It Was Not Objectively Reasonable To Shoot Rexford Dasrath Five Times

Claims that a police officer has used excessive force are analyzed under the Fourth

Amendment's reasonableness standard.[8]  Courts assess reasonableness using a number of

factors, such as the severity of the crime at issue, whether the suspect posed an immediate threat

to the safety of the officers or others, and whether the suspect actively resisted or attempted to

evade arrest.[9]  Most relevant, it is settled law that "[i]t is not objectively reasonable for an officer

to use deadly force to apprehend a suspect unless the officer has probable cause to believe that

the suspect poses a significant threat of death or serious physical injury to the officer or

others,"[10] even if the suspect threatens the officer with a weapon.[11]  This analysis "requires

careful attention to the facts and circumstances of [the] particular case," as the court's "role . . . is

to determine whether a jury . . . could reasonably find that the force used was excessive," in

which case the court should "leave[] the factual determination of excessiveness to a jury."[12]

Here, Defendants' reasonableness argument depends on omitting key facts and

mischaracterizing their own version of the facts as undisputed, and then concluding based on that

warped record that Defendant Officers' actions were reasonable.  That is not how summary

judgment works.  In fact, "given the difficult problem posed by a suit for the use of deadly force,

in which the witness most likely to contradict [the police officer's] story—the person shot

dead—is unable to testify[,] . . . the court may not simply accept what may be a self-serving

account by the police officer."[13]  Rather, the Court must accept Plaintiff's evidence as true,

---

[8] *Graham v. Connor*, 490 U.S. 386, 394 (1989).
[9] *Id*. at 396.
[10] *O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003).
[11] *Nash v. Cahill*, 1996 U.S. Dist. LEXIS 10292 at *9-10 (S.D.N.Y. Jul. 19, 1996).
[12] *See Brown v. City of New York*, 798 F.3d 94, 102–03 (2d Cir. 2015).
[13] *O'Bert* at 37 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

drawing all reasonable inferences in Plaintiff's favor.[14]  And as Plaintiff's more accurate and fulsome description of the record here shows, there is at best a disputed factual issue as to whether Officer Guzman's use of deadly force was objectively reasonable in light of the perceived threat—indeed, the weight of the evidence establishes that Rexford was not a threat to anyone:

**Nature of the threat**:  Defendant Officers had no idea when they arrived on the scene that Rexford allegedly placed the threatening phone call that prompted the "10-39."  *See* Ex. 6, Guzman Dep. 57:20-58:10.  The officers' alleged assessment that Rexford was a threat relies heavily on their claim that Rexford charged at their car while yelling with his knife raised (*see* Memo. at 17).  But, that is disputed.  Maldonado testified that he saw Rexford walk toward the patrol car, but never saw Rexford lunge toward the car, threaten Defendant Officers, or attempt to injure them.  Counterstatement ¶ 18.  It is likewise disputed whether Maldonado "warn[ed]" the officers about Rexford harassing people with a knife, as they claim.  Maldonado testified that he informed the Defendant Officers that Rexford had a "mental problem," but never told them that Rexford had threatened anyone or had a weapon.  *Id*. ¶ 29.  Nor does any produced document identify any member of the public at the scene of the incident who expressed fear of Rexford.  *Id*. ¶ 23.

Even the length of the knife is disputed.  Photographic evidence establishes that it was a sandwich knife with a 3-inch blade; Defendants insist that it was a much more threatening steak knife with a blade 5-7 inches long.  *Id*. ¶ 17.  And according to their own testimony, when the Officers returned to Hart Street after turning the corner, neither Officer could tell whether Rexford was still in possession of the knife.  *Id*. ¶ 40.  Further, Defendants state that Rexford

---

[14] *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).

yelled "You want to fight?" (Memo. at 6), neglecting to mention that:  (i) Officer Guzman recalled this "threat" for the first time at his deposition, and (ii) it contradicts Officer Guzman's contemporaneous statement and Officer Ermann's testimony that Defendant Officers could not understand anything Rexford was saying.  Counterstatement ¶ 51.  Thus, there is a substantial factual dispute as to whether it was reasonable for Officer Guzman to believe that Rexford posed an immediate threat to the officers' safety or the safety of the public.

      **Distance**:  In a particularly glaring omission, Defendants' brief includes no discussion of the distance between Rexford and Defendant Officers before or during the shooting.  This is no accident—those distances are in significant dispute and are directly relevant to whether the shooting was reasonable.  Officer Guzman testified that Rexford was up to ten feet away when he fired his first shot, but witness Samuel Martinez stated that Rexford was as far as *thirty feet away* from the officer when Guzman first fired.  *Id*. ¶ 52; Defs. Ex. O.  Indeed, each witness statement Defendants cite estimates a different distance.[15]  *See* Defs. Ex. N; Defs. Ex. O.  Witness Jose Luis Soto reported that at the time Rexford *collapsed on the ground*, he was still approximately "5 yards" away from Defendant Officers.  Counterstatement ¶ 72.  This testimony, as well as the fact that Officer Guzman was backpedaling and Rexford was over 350 pounds and would have had difficulty rapidly closing *any* distance, indicates that there was a safe distance between Officer Guzman and Rexford and that distance was not breached.  *Id*. ¶ 72.  Further, there were admittedly no civilians in the immediate vicinity of the shooting at the time of the incident.  *Id*. ¶ 44.  Under these facts, Rexford could not have posed a significant threat to Defendant Officers or to the public.

---

[15] *See O'Bert* at 37 (the Court "must also consider circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.").

Thus, there is at the very least a factual question as to whether Officer Guzman's actions were reasonable. Moreover, the cases cited by Defendants are inapposite. *See* Memo. at 12-14. Unlike Rexford, who (as described above) did not pose an obvious danger to the public, the plaintiffs in the cited cases presented clear and obvious dangers to the public—such as by firing a gun near a school or while running from officers.[16] Furthermore, many of Defendants' cases involved situations where the officers had distinct reasons to fear for their own lives, such as being trapped in a train car with a sword-swinging plaintiff, facing a plaintiff who stole a car at knifepoint and swung a thirteen-inch knife at the officer, or coming face-to-face with a plaintiff who drew a six to eight inch butcher knife.[17] In contrast, Rexford: (i) was sitting on his stoop; (ii) had not committed a violent crime; and (iii) was shot repeatedly though he was at least ten— and perhaps up to 30 feet—away and holding a sandwich knife with a three-inch blade. A reasonable jury could easily find that Officer Guzman's use of force was not objectively reasonable, making summary judgment on the excessive force claim inappropriate.

### B.     The Degree Of Force Used Was Not Objectively Reasonable

Whether or not the initial use of force was appropriate, the amount of force ultimately used by Officer Guzman certainly was not. Officers do not have "license to use force without limit," as "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer."[18] Thus, although the Fourth Amendment does not preclude police officers from firing

---

[16] *See Nash*, 1996 U.S. Dist. LEXIS 10292 at **9-10 (after being alerted that a man fitting suspect's description was firing gun near public school, officers discovered suspect in a schoolyard with firearm); *Routier v. O'Hara*, 2013 U.S. Dist. LEXIS 99947 (E.D.N.Y. Jul. 16, 2013) (prior to officer's use of force, plaintiff shot firearm while running from officers).
[17] *See Stevens v. Metro. Transp. Auth. Police*, 293 F. Supp. 2d 415 (S.D.N.Y. Dec. 3, 2003); *Biggs v. City of New York*, 2010 U.S. Dist. LEXIS 121332 (S.D.N.Y. Nov. 15, 2010); *Jackson v. City of Rochester*, 705 F. Supp. 779 (W.D.N.Y. Jan. 31, 1989).
[18] *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000).

13

multiple rounds to protect themselves, the firing of *each* round must be objectively reasonable.[19]

Here, even if Officer Guzman's initial use of force against Rexford (the first shot) were found to be reasonable, the subsequent four shots were not.  After firing the first shot, Officer Guzman never reevaluated whether Rexford was a threat.  Counterstatement ¶ 65.  Indeed, Officer Guzman testified that after firing the first shot he saw Rexford grimace, and after the fourth shot he saw Rexford pull his hand up to his chest.  *Id*. ¶ 66.  And there is credible evidence that Rexford was already falling after the first shot, as Dr. McCubbin testified that Rexford's bullet wounds all had trajectories consistent with Rexford leaning *or falling forward*.  *Id*. ¶ 65. Taken together, this evidence shows not only that Rexford was severely injured and unable to pose a threat after the first shot, but that Officer Guzman had the wherewithal to perceive Rexford's reactions to each shot and yet never reevaluated his decision to continue shooting a gravely injured man.  The fifth shot, after Officer Guzman saw Rexford lower the knife and clutch at his chest, is particularly egregious, and a reasonable jury could certainly find that Rexford no longer posed a threat at that point.  Under these circumstances, and construed in Plaintiff's favor, Officer Guzman's continued use of deadly force was not objectively reasonable.[20]  These disputed facts preclude summary judgment as to the excessive force claim.

### C.    The Assault and Battery Claims Survive Summary Judgment

"The test for whether a plaintiff can maintain a New York State law assault and battery

---

[19] *Alvarez v. City of New York*, 2017 WL 1506563, at *4 (S.D.N.Y. Apr. 27, 2017) ("[A] grant of qualified immunity as to the use of force—even lethal force—in the course of an event does not necessarily extend to all use of such force throughout the incident.").

[20] *See Alvarez*, 2017 WL 1506563 at *4 (recognizing that the continued use of deadly force in firing multiple rounds was not reasonable); *see also Pierre*, 2006 WL 1292076, at *4 (holding that the use of force against an already subdued individual would constitute excessive force); *Read v. Town of Suffern Police Dept*., 2013 WL 3193413 (S.D.N.Y. June 25, 2013) (denying summary judgment where plaintiff claimed second, unnecessary tasing was excessive force); *see Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 385 (S.D.N.Y. 2013) (holding it plausible "that any discharge after the first constituted an unnecessary infliction of pain").

cause of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim."[21]  Because disputed facts preclude summary judgment as to excessive force, they necessarily preclude it as to assault and battery, too.[22]

And in any event, a rational fact finder could conclude from the record that the officers committed:  (i) assault—"the intentional placing of another person in fear of imminent harmful or offensive contact"[23]—by approaching Rexford in front of his home with their guns drawn while yelling at him,[24] which the NYPD recognizes could create fear in an EDP (*see* Counterstatement ¶¶ 45, 47); [25] and (ii) battery by making "intentional wrongful physical contact with [Rexford] without consent"[26]—i.e., by shooting him.  And contrary to Defendants' assertion that they have a justification defense (*see* Memo. at 18), whether Defendants' actions were justified is clearly a disputed factual question that cannot be resolved on summary judgment.

## II.  DISPUTED ISSUES OF MATERIAL FACT BAR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS

A police officer is "entitled to qualified immunity" only if he "has an objectively reasonable belief that his actions are lawful."[27]  In excessive force cases, the qualified immunity inquiry is the same as the Fourth Amendment reasonableness inquiry.[28]  Because, as established above, Officer Guzman's use of force was not objectively reasonable, Defendants' qualified

---

[21] *Chen v. City of Syracuse*, 2009 WL 529553, at *5 (N.D.N.Y. Mar. 2, 2009).
[22] *Benson v. Yaeger*, 2009 WL 1584324, at *10 (W.D.N.Y. June 3, 2009) ("Because there is a genuine issue of material fact as to . . . excessive force . . . there is likewise a genuine issue of material fact as to . . . assault and battery").
[23] *See Chamberlain*, 986 F. Supp. 2d at 398.
[24] *Cerbelli v. City of New York*, 2008 U.S. Dist. LEXIS 109341 (E.D.N.Y. Sep. 8, 2008) (recognizing that "police officer defendants each engaged in behavior that may constitute assault, e.g., pointed a gun at, [or] shot" plaintiff).
[25] *See id.* at *75 (holding that whether victim "apprehended harm or imminent danger from police officer defendants' actions is . . . a question of fact for a jury to resolve").
[26] *Chamberlain*, 986 F. Supp. 2d at 398.
[27] *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415 (2009).
[28] *See O'Bert*, 331 F.3d at 37.

immunity argument fails for the same reasons as its excessive force claim.[29]

Defendants nevertheless state in support of their qualified immunity argument that the "undisputed facts" are that "plaintiff rapidly approached a police officer [sic] while a knife in hand after just displaying an act of aggression, both verbally and physical."  Memo. at 17.  But these very facts are in dispute.  Indeed, Defendants' version of the facts relies heavily on the self-serving testimony of Defendant Officers—which is irrelevant[30] to the inquiry—and cannot support Defendants' claim for summary judgment.[31]  It is for the jury to decide whether to credit the officers' testimony and for them to determine whether the officers' claimed subjective beliefs were in fact objectively reasonable.[32]  As such, summary judgment on the basis of qualified immunity should be denied.

## III.   THE NEGLIGENCE CLAIM CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Defendants' summary judgment motion also fails as to their assertions regarding negligence.  To prove negligence, Plaintiff must show:  "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result."[33]  Both the Second Circuit and the New York Court of Appeals agree that the question of breach should generally be decided by the jury, as it is "settled that

---

[29] Defendants brief the issue of "failure to intervene" (Memo. at 15-16); however, Plaintiff previously informed Defendants that he would not pursue this claim.

[30] *Read*, 2013 WL 3193413, at *4 ("[a]n officer's subjective beliefs and motivations are irrelevant to the qualified immunity analysis").

[31] *See O'Bert* at 37 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[G]iven the difficult problem posed by a suit for the use of deadly force, in which the witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify[,] .... the court may not simply accept what may be a self-serving account by the police officer.")).

[32] *Cerbelli*, 2008 U.S. Dist. LEXIS 109341, at *42 ("a genuine issue of material fact precludes the court from granting summary judgment on the basis of qualified immunity since it becomes impossible to determine whether the officers reasonably believed that their force was not excessive").

[33] *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006).

negligence cases by their very nature do not lend themselves to summary dismissal since often . . . the very question of negligence is itself a question for jury determination."[34]

The record evidence establishes that the Defendant Officers' careless behavior leading up to the shooting fell below the requisite standard of care and proximately caused the harm Rexford suffered.  The NYPD's Patrol Guide ("Patrol Guide") and Student's Guide ("Police Student's Guide")—which delineate the standard of care[35]—explicitly discuss how an officer must behave in situations involving the exercise of deadly force or emotionally disturbed persons.  *See* Exs. 9 and 3.  Defendant Officers' actions violated these longstanding NYPD procedures in at least four respects.

*First*, Defendant Officers failed to properly identify Rexford as an EDP, despite their training and the NYPD's guidelines on how to recognize indicators of an EDP.  Moreover, identifying Rexford as an EDP should have been easy—witness Maldonado informed the officers that Rexford had a "mental problem," and other NYPD officers had previously recognized and documented Rexford as an EDP.  *See* Counterstatement ¶ 34.  Yet, despite their extensive training and though Officer Ermann thought Rexford was acting "erratic[ally]" and Officer Guzman thought Rexford's behavior was "not rational," Defendant Officers negligently failed to recognize Rexford as an EDP.

Had they recognized Rexford as an EDP, the entire incident would have played out

---

[34] *McCummings v. New York City Transit Auth.*, 81 N.Y.2d 923, 926 (1993); *Williams*, 453 F.3d at 119 ("It [is] particularly appropriate to leave [a finding of breach] to the jury, not only because of the idiosyncratic nature of most tort cases, or because there was room for a difference in view as to whether [the defendant's] conduct in the particular circumstances of this case did or did not evidence a lack of due care, but, perhaps above all, because in the determination of issues revolving about the reasonableness of conduct, the values inherent in the jury system are rightfully believed an important instrument in the adjudicative process").

[35] *See, e.g.*, *Smith v. City of New York*, 2015 WL 4643125, at *3 (S.D.N.Y. Aug. 5, 2015) ("The Patrol Guide has frequently been accepted as evidence of the standard of care to be exercised by a police officer"); *Lubecki v. City of New York*, 758 N.Y.S.2d 610, 616 (1st Dep't 2003).

differently.  The Patrol Guide explains steps an officer must pursue after identifying an EDP, such as communicating with supervisors about the EDP, requesting Emergency Service Unit ("ESU") assistance, and requesting an ambulance.  Ex. 9, Patrol Guide at 216.05.  If Officers Guzman and Ermann had properly recognized the EDP indicators, they would have involved their supervisors, ESU assistance, and dispatch, thereby minimizing the risk of harm to Rexford.  Indeed, the Brooklyn North Investigations Unit criticized the Defendant Officers' failure to properly report the situation in its Final Firearms Discharge Report ("Final Report"):  "advising central of the emerging circumstances and requesting a 10-85 forthwith with the Emergency Service Unit would have given the officers further resources and backup necessary to help with this encounter."  Counterstatement ¶¶ 37–38.

　　　　*Second*, the officers' decision to approach Rexford was reckless.  The Patrol Guide states that officers should maintain a minimum zone of safety of twenty feet from an EDP.  *Id*. ¶ 36.  Rather than maintain the requisite zone of safety, there is at least some evidence that the officers approached to within at least 15 feet of Rexford.  The Brooklyn North Investigations Unit recognized this error too, explaining that the officers' conduct had placed them at a tactical disadvantage.  *See* Ex. 11, DEF884-85 ("Officer Guzman is indicated to have approached the suspect and come within ten to fifteen feet of the suspect with no cover between himself and the suspect.  This approach placed the officer in a tactical disadvantage.").

　　　　*Third,* there was no basis under the NYPD's guidelines for the officers to draw their firearms.  The Patrol Guide, listing "Guidelines for the use of firearms," provides that "[p]olice officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury."  Ex. 9, Patrol Guide at 203-12.  There is no evidence that the officers were in immediate danger of death or physical injury.  Instead, the record confirms that when the

officers turned back onto Hart Street, after their initial encounter with Rexford, Rexford was sitting on his stoop and that the officers were half a block away.  Counterstatement ¶ 34.  Given this distance and that Rexford was sitting down, there necessarily was no *immediate* risk of harm.  *Id.*  What is more, (i) not a single witness testified that they felt threatened by Rexford; (ii) according to Officer Ermann, no civilians were in the immediate area; and (iii) the Defendant Officers did not know whether Rexford was still holding the knife.  *Id.* ¶¶ 35-40, 44.  In light of these facts, there was no basis to use deadly physical force under the NYPD's guidelines, and doing so breached the standard of care.

*Fourth*, the guidelines prohibit certain conduct when confronting an EDP.  Officers should not "order, command, warn, or threaten [an EDP]," as doing so creates "fear/resistance, invites testing, and promotes rebellious behavior," which can force an unnecessary confrontation. *Id*. ¶ 47.  The guidelines illustrate the ensuing consequences if an officer fails to follow the policy, offering a hypothetical in which an officer encounters an EDP "who is wielding a knife" and "[i]nstead of following approved procedures—by trying to contain and calm the EDP and talk him into custody," the officer "draws his firearm, walks up on the EDP, and loudly demands that the EDP drop his knife immediately."  *Id*. ¶ 39.  The officer's improper conduct "agitates the EDP even further," the guidelines explain, causing the EDP to "suddenly run[] at [the officer] with his knife raised."  *Id*.  The guide warns that the officer's actions "unnecessarily forc[ed] this confrontation," and notes that "[s]uch cases also are likely to result in civil suits against officers and the Department" that the Department is likely to lose.  *Id.*  Like the NYPD's example, the officers here approached Rexford (an EDP), repeatedly yelling at him to drop the knife with their guns drawn.  In doing so, they violated the basic principles of their training and unnecessarily forced a confrontation that ultimately led to Rexford's death.

Defendant Officers' repeated violations of NYPD guidelines amount to a series of

19

reckless actions that were the proximate cause of Rexford's harm; as such, summary judgment as to the negligence claim would be improper.  Defendants' two arguments to the contrary lack merit.  *See* Memo. at 20.  *One*, contrary to Defendants' assertion, Plaintiff does not need to demonstrate a "special relationship" between Rexford and the City of New York to state a negligence claim.  *Id.*  The "special relationship" test is applicable only when a plaintiff asserts that he was injured by the "breach of a duty owed to the general public, such as a duty to provide police protection, fire protection, or ambulance services"[36]—i.e., in cases such as those cited by Defendants, where the Plaintiff alleged negligence because:  (i) the City's emergency services did not arrive in time to save a decedent having trouble breathing,[37] or (ii) officers would not escort a women to her apartment where her husband subsequently attacked her with a knife.[38]  In contrast, Plaintiff does not argue that Rexford's injuries stemmed from the failure of the NYPD to protect him from an outside harm; rather, the injuries here were a result of Defendant Officers' negligent behavior.  The "special relationship" test is not applicable—nor do any of the cases cited by Defendants even suggest it is applicable under facts analogous to those here.

*Two*, Defendants' contention that Plaintiffs cannot maintain both the excessive force and negligence claims because Officer Guzman's *intentional* firing at Rexford cannot be negligent misses the mark.  Courts in this and other jurisdictions have allowed negligence claims to proceed beyond summary judgment irrespective of concurrent claims of excessive force or intentional torts.[39]  Indeed, this Court itself stated at the pre-motion hearing that "[t]he question about negligence versus intentional conduct, again, I really believe that, under the appropriate

---

[36] *Etienne v. New York City Police Dept.*, 37 A.D.3d 647, 649 (2d Dept. 2007).
[37] *Id.*
[38] *Graham v. City of New York*, 136 A.D.3d 747 (2d Dept. 2016).
[39] *See, e.g.*, *Negron v. City of New York*, 976 F.Supp.2d 360, 373-74 (E.D.N.Y. 2013); *Carbocci v. Lake Grove Entm't, LLC*, 883 N.Y.S.2d 113, 115 (2009); *Wilson v. Roberson*, 1996 WL 63053 (S.D.N.Y. Feb. 14, 1996).

factual scenario, a reasonable jury could find that behavior in this instance was negligent but not

an intentional tort."  Transcript of Pre-Motion Conference at 3:24–4:2.  Moreover, Defendants

hamstring their own argument by noting that "[w]hen a plaintiff asserts excessive force and

assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence

claim *with respect to the same conduct* will not lie."  Memo. at 19.  As explained above, Plaintiff

does not rely on the same conduct for its excessive force and negligence claims—the excessive

force claim revolves around whether the intentional act of shooting was reasonable, whereas the

negligence claim hinges on whether the actions the officers took leading up to the shooting

violated the officers' duty of care and proximately caused Rexford's death.  In fact, the Patrol

Guide's statement that this very fact pattern will cause the city to lose a civil trial indicates that

the City itself believes that a negligence claim (and if not negligence, an excessive force claim)

would be appropriate (and victorious) in precisely this situation.  The Court should therefore

deny Defendants' summary judgment motion as to the negligence claim.

## IV.     THE WRONGFUL DEATH ACTION CANNOT BE RESOLVED ON SUMMARY JUDGMENT

Defendants' motion for summary judgment as to the sixth cause of action for wrongful

death also must be denied.  To prevail on that claim, plaintiff must establish:  "(1) the death of a

human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's

death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the

death of decedent and (4) the appointment of a personal representative of the decedent."[40]

Defendants do not contest the first and fourth elements—Rexford is deceased and Arnel Dasrath

was duly appointed as his personal representative (*see* Ex. 15 PLF 28-31)—and the record

---

[40] *See Chong v. New York City Transit Auth*., 83 A.D.2d 546, 547 (1981) (citing N.Y. Est.
Powers & Trusts Law § 5-4.1).

evidence proves the second and third elements.

The second element is satisfied because, as explained above, the Defendant Officers' conduct was either wrongful[41] (because it used excessive force and was an assault and battery) or negligent,[42] and caused Rexford's death.  As for the third element, Rexford's father Arnel Dasrath (who qualifies as a distributee[43]) has suffered pecuniary loss, as evidenced by invoices and receipts showing costs incurred for Rexford's funeral.[44]  Ex. 16, Funeral Invoice and Receipt (PLF 2-3).  That Arnel did not personally pay the funeral expenses is of no consequence, given that he ultimately will be responsible for those expenses, which is all the statute requires.[45]  *See* Ex. 17, February 16, 2017 Deposition of Arnel Dasrath at 65:25-66:3.  Given the overwhelming evidence supporting a wrongful death claim, summary judgment must be denied.[46]

## V.   DEFENDANTS ARE NOT ENTITLED TO GOVERNMENTAL IMMUNITY

Under New York law, governmental immunity is only available to a defendant who can

---

[41] *Werra v. Cassedy*, 243 N.Y.S. 545, 591-92 (1930) (the wrongful death statute "also concerns a cause of action for wrongful act or default causing death of decedent," thereby embracing "any wrongful death predicated upon facts which do not constitute negligence.").

[42] *Negron*, 976 F. Supp. 2d at 373-74 (holding that where the claims for excessive force, assault, battery, and negligence survived summary judgment, so did the claim for wrongful death—given that the latter is derivative of the former claims).

[43] *See* N.Y. Est. Powers & Trusts Law § 4-1.1 (McKinney).

[44] *See* N.Y. Est. Powers & Trusts Law § 5-4.3 (damages awarded include "reasonable funeral expenses of the decedent paid by the distributees"); *see also Estate of Ramos*, 539 N.Y.S.2d 692, 693 (Sur. 1989) (recognizing funeral expenses as a pecuniary loss).

[45] *See* § 5-4.3 (pecuniary loss includes payments "of which any distributee is responsible").

[46] Defendants do not seek summary judgment as to the fifth cause of action, conscious pain and suffering.  If they did, the motion would fail.  "[A] claim for conscious pain and suffering requires a claimant to present only proof that the injured party experienced some level of cognitive awareness following the injury."  *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 183 (S.D.N.Y. 2013), *amended by*, 996 F. Supp. 2d 221 (S.D.N.Y. 2014).  A plaintiff can demonstrate consciousness through circumstantial or direct evidence.  *Pinckert v. Trucklease Corp.*, 2006 WL 903176, at *1 (S.D.N.Y. 2006).  Rexford was still moving after he fell as a result of Officer Guzman's five shots at around 3:01, and was not pronounced dead until approximately 3:45.  Counterstatement ¶ 73; SOUF ¶¶ 78, 82.  Thus, Rexford was alive and experienced at least some level of cognitive awareness following the injury, making summary judgment inappropriate.

22

show "[1] an exercise of discretion [2] in compliance with [the municipality's] own procedures."[47]   There are genuine issues of fact as to both elements.

**Discretion**:  Defendants must establish that "the action taken"—here, the Officers' careless behavior in engaging with Rexford Dasrath, leading to his death—"*actually resulted from* discretionary decision-making—i.e., the *exercise of reasoned judgment*."[48]   Courts routinely refuse to grant immunity when evidence shows that government employees failed to consider the situation at issue, "weigh[] the impact," and make an "informed" decision.[49]   Here, Defendants themselves stated that the Officers did not exercise reasoned judgment, as they:  (i) "did not consider" using nonlethal force (Memo. at 5), (ii) never assessed Rexford's behavior according to NYPD guidelines or considered whether Rexford was an EDP (Counterstatement ¶¶ 26, 29, 35, 37, 40), and (iii) did not consider whether to follow NYPD procedures for dealing with EDPs.  *Id*. ¶ 19.  Moreover, Officer Guzman admits that he did not reassess between shots and did not consider whether additional shots were necessary.  *Id*. ¶ 65–66.  Defendant Officers' failure to consider the situation and weigh the potential impact of the available options was not an exercise of reasoned judgment, and is thus ineligible for immunity.

**Compliance with Procedures**:  "The very basis for the value judgment supporting immunity and denying individual recovery for injury becomes irrelevant where the municipality violates its own internal rules and policies."[50]   Thus, even if the officers' actions had been reasoned, they still would not merit governmental immunity because (as discussed *supra* 18–21)

---

[47] *Haddock v. City of New York*, 75 N.Y.2d 478, 485 (1990).
[48] *Valdez v. City of New York*, 18 N.Y.2d 69, 80–81 (2011).
[49] *Haddock*, 76 N.Y.2d at 485–86 (denying immunity where City officials failed to read or request criminal history reports before hiring convicted rapist); *see also Trimble v. City of Albany*, 133 A.D.3d 1484 (3rd Dept. 2016) (denying immunity where evidence showed no "indication that consideration was given to" how to handle material that rekindled a fire).
[50] *Haddock*, 75 N.Y.2d at 485.

they violated the NYPD's written guidelines in at least four distinct ways.  Thus, summary

judgment on the basis of governmental immunity would be inappropriate.[51]

## VI.   THIS COURT SHOULD RETAIN JURISDICTION OVER THE STATE LAW CLAIMS EVEN IF THE COURT DISMISSES THE EXCESSIVE FORCE CLAIM

Even if the Court dismisses the federal excessive force claim, it can and should retain

jurisdiction over the remaining state law claims.[52]  Supplemental jurisdiction is meant to be a

"doctrine of flexibility," and in deciding whether to retain or decline jurisdiction, courts should

determine what course "most sensibly accommodates a range of concerns and values," including

"economy, convenience, fairness, and comity."[53]  Here, these factors weigh in favor of this Court

retaining jurisdiction.  This case does not involve any "novel legal questions" of state law that

ought to be decided by a state court, so there is no judicial comity issue.[54]  And given the

extensive time and effort invested in proceedings to date—almost three years, including months

of discovery—it would be a "waste of judicial resources" to dismiss on the eve of trial and force

Plaintiff to re-file in state court and begin again.[55]  Moreover, dismissal on solely jurisdictional

grounds would unfairly place a disproportionate burden on Arnel Dasrath—who is near-indigent

and dependent on pro bono counsel—and could ultimately exempt Defendants from ever being

---

[51] *See Johnson v. City of New York*, 15 N.Y.2d 676, 683-84 (2010) (denying summary judgment where "it [did] not seem possible to conclude as a matter of law that the necessary judgment was exercised and, concomitantly, that there was not violation of the [police] guideline[s]").

[52] *See Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 132 (2d Cir. 2007) ("the dismissal of [the sole federal claim] does not deprive us of subject-matter jurisdiction"); *Gem Corrugated Box Corp. v. Nat'l Kraft Container Corp.*, 427 F.2d 399, 501 n.1 (2d Cir. 1970) (affirming that District Court properly retained supplemental jurisdiction over remaining causes of action even after dismissal of federal claims).

[53] *Raucci v. Rotterdam*, 902 F.2d 1050, 1054–55 (2d Cir. 1990) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350–51 (1988)).

[54] *Id*.

[55] *Raucci*, 902 F.2d at 1055 (affirming decision to retain supplemental jurisdiction despite dismissal of federal claim where discovery had already been completed and the parties were ready for trial).

forced to answer at trial for the killing of Rexford Dasrath.  Thus, even if this Court sees fit to dismiss the federal claim for excessive force, it should retain jurisdiction over the remaining state law claims, in order to ensure that resources are not wasted, and that Mr. Dasrath has a fair opportunity to seek justice and restitution for the death of his son.

## **CONCLUSION**

For the reasons stated above, the Court should deny Defendants' motion for summary judgment.

Dated: November 17, 2017

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Filko Prugo*

Filko Prugo (fprugo@omm.com)
Moshe Mandel (mmandel@omm.com)
Eberle Schultz (eschultz@omm.com)
Catherine D. Nagle (cnagle@omm.com)
Alison K. Ward (award@omm.com)
7 Times Square
New York, New York  10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

*Counsel for Plaintiff Arnel Dasrath, as Administrator of the Estate of Rexford Dasrath*