FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ SEP 25 2018 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ARNEL DASRATH, as Administrator of
the Estate of Rexford Dasrath,

               Plaintiff,

   - against-

CITY OF NEW YORK, Police Officer
NICHOLAS GUZMAN, in his individual
capacity, and Police Officer KEVIN ERMANN,
in his individual capacity,

               Defendants.
-------------------------------------------------------X

**MEMORANDUM DECISION
AND ORDER
15-CV-766 (AMD) (RLM)**

**ANN M. DONNELLY, United States District Judge:**

On February 13, 2015, the plaintiff, Arnel Dasrath, the father of and estate administrator for the decedent Rexford Dasrath, commenced this action against the defendants, the City of New York ("City"), Police Officer Nicholas Guzman, and Police Officer Kevin Ermann, alleging excessive force, failure to intervene, and municipal liability pursuant to 42 U.S.C. § 1983, as well as assault and battery, conscious pain and suffering, wrongful death, and negligence. (ECF Nos. 1, 13.)  On October 16, 2017, the defendants moved for summary judgment to dismiss the complaint in its entirety.  For the reasons stated below, the defendants' motion is denied in part, and granted in part.

BACKGROUND

1.     <u>Facts</u>[1]

---

[1] Unless otherwise noted, the following facts are based on my review of the entire record, including the parties' 56.1 statements. I construe the facts in the light most favorable to the plaintiff, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Both parties cite statements that witnesses gave to the police during the investigation into the shooting. (*See* ECF Nos. 51-12, 51-13, 51-14, 51-15, 55-13, 55-19.) These statements are hearsay and do not appear to be admissible. However, neither party objected to the use of the witnesses' statements on summary judgment. *See Richards v. Princeton Ins. Co.*, 178 F. Supp. 2d 386, 390 n.1

1

This case arises out of the fatal shooting of an emotionally disturbed man by a New York City police officer in Brooklyn, New York. On November 18, 2013, 22-year old Rexford Dasrath called his mother's landlord, Yan Zhan, and left a voicemail message threatening to kill him. (Pl.'s Rule 56.1 Counter-Statement ("Pl.'s 56.1") ¶¶ 1, 7-9.) Mr. Zhan called the police and reported the threatening message. (ECF No. 51-3.)[2] 83rd Precinct Police Officers Nicholas Guzman and Kevin Ermann were on patrol in a marked police car, and received a radio transmission at around 2:55 p.m., advising them of a "harassment over the phone" at 902 Hart Street. (Pl.'s 56.1 ¶¶ 10-15.) The officers responded to the address within minutes of receiving the radio call. (*Id.* ¶ 15.) Officer Ermann, the driver, had his window down. (*Id.* ¶¶ 14, 20.) The officers were wearing Kevlar vests, and each had his gun, pepper spray, and expandable baton. (*Id.* ¶¶ 1-2.) The officers had never encountered Mr. Dasrath and were unaware of any encounters between him and other 83rd Precinct officers. (*Id.* ¶¶ 24-25.)

The parties dispute the events that occurred when the officers arrived at the scene. According to the officers, Mr. Dasrath—who was between five feet eight inches tall and six feet, and weighed about 350 pounds—was sitting on his stoop, holding a steak knife and a drinking glass. (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 9-16.) The officers contend that the steak knife had a blade approximately five to seven inches long. (*Id.* ¶ 17.)[3] When Mr. Dasrath saw

---

(S.D.N.Y. 2001) (considering unsworn and uncertified documents where the defendant has not raised any objections) (citing *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 114 (2d Cir. 1987)); *accord Griffin v. City of New York*, 287 F. Supp. 2d 392, 397 (S.D.N.Y. 2003). At a status conference with the parties on August 21, 2018, the parties agreed that the witnesses are in New York, are available to testify at trial, and that counsel would subpoena them if necessary. (Transcript of Aug. 21, 2018 Status Conference, at 3-4.) Thus, I consider these statements at summary judgment. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 43–44 (S.D.N.Y. 2008) (considering hearsay evidence at summary judgment stage where "the plaintiff appears able to identify and subpoena all of the relevant declarants reported in the public records" and "[t]hese individuals may be called at trial to testify"); *accord Benoit v. Metro. Transportation Auth.*, No. 15 CIV. 6095(JFK), 2016 WL 6902190, at *7 (S.D.N.Y. Nov. 21, 2016).

[2] The transcript of the radio transmissions reflects that the calls came in at 2:54 p.m. (ECF No. 51-3.)
[3] Neither officer connected Mr. Dasrath to the harassment report.

2

the patrol car, he "yell[ed] unintelligibly," and "charged" the driver's side of the car with the knife in his left hand, in a raised position. (*Id.* ¶¶ 18-20; *see* Ex. A to the Sundaran Decl., Ermann Dep., ECF No. 51-1, 67:25-72:7; Ex. B to the Sundaran Decl. ECF No. 51-2, Guzman Dep. 59:21-24, 71:5-6.) The officers claim that Mr. Dasrath hit the patrol car with his knife. (Defs.' 56.1, ¶ 22; ECF No. 51-1, 73:15-24; ECF No. 51-2, 90:2-18.) The plaintiff responds that Pedro Maldonado, a livery cab driver, testified that he saw Mr. Dasrath walk towards the patrol car when the officers arrived. (ECF No. 55-8, at 11:13-19, 12:16-14:15.) According to the plaintiff, Mr. Maldonado testified that he did not see Mr. Dasrath with a knife, or see him threaten the officers.[4] (*Id.*) Photographs of the knife recovered from the scene show that the knife was about six inches long, with an approximately three-inch blade. (ECF No. 55-9.)

It is undisputed that as soon as Mr. Dasrath approached their car, the officers moved the car up the street.[5] (Defs.' 56.1 ¶ 21.) The parties agree that Mr. Maldonado pulled up next to the officers' car and spoke to Officer Guzman, but they disagree about the substance of that conversation. (*Id.* ¶ 29.) Mr. Maldonado testified that he tried to tell the officers that he lived in the area and that Mr. Dasrath had a "little mental problem." (ECF No. 55-8, at 15:13-17:20.) He made a hand gesture to demonstrate what he meant by "mental problem" but was not sure if the officers understood him because he did not speak much English. (*Id.*) The officers thought that Mr. Maldonado made a "stabbing motion . . . as if he was being threatened with a knife and referring to [Mr. Dasrath];" they interpreted the gesture as a warning about Mr. Dasrath's threatening behavior. (ECF No. 51-1, at 81:7-82:2-4; ECF No. 51-2, 67:1-25.)

---

[4] Mr. Maldonado testified that he did not notice whether Mr. Dasrath had a knife as he "just passed by," and that he "didn't really check." (ECF No. 55-8, at 11:13-19.)
[5] Mr. Maldonado said that the officers' car moved forward when Mr. Dasrath got to the door. (ECF No. 55-8, at 14:3-15:12.)

3

While Officer Guzman spoke to Mr. Maldonado, the decedent threw a glass in the general direction of the patrol car, striking Mr. Maldonado's livery cab. (Defs.' 56.1, ¶¶ 27, 30.) Mr. Maldonado drove away, as did the officers. (*Id.* ¶ 31.) The officers turned left onto Irving Avenue and parked their car. (*Id.* ¶¶ 31-34.) Officer Ermann made a radio request for additional officers, and the officers got out of the car. (*Id.* ¶¶ 31-34, 37.) Both officers concluded that this was a "guns-out situation" and drew their weapons; neither officer considered alternative methods of subduing Mr. Dasrath.[6] (*Id.* ¶¶ 33-36; ECF No. 51-1, 87:14-92:24; 113:9-16; ECF No. 51-2, 83:5-22, 89:4-12.)

The officers walked towards Mr. Dasrath; Officer Ermann was in the middle of the street and Officer Guzman was on the sidewalk. (Defs.' 56.1, ¶ 43.) At this point, according to the defendants, Mr. Dasrath was sitting on his stoop facing the street. (Defs.' 56.1, ¶ 45.) He stood up when the officers approached him. (*Id.* ¶ 46.) Another witness, Maurice Moctezuma, told the police that Mr. Dasrath was going into his house when the officers approached, and that they called him over. (ECF No. 55-13.)

The plaintiff does not deny that Mr. Dasrath was holding a knife at this point. (Pl.'s 56.1 ¶¶ 67, 75; ECF No. 55-9.) The parties also agree that the officers, who stopped anywhere between 15 to 30 feet away from the decedent, yelled at Mr. Dasrath multiple times to drop the knife. (ECF No. 51-1, at 130:22-24; ECF No. 51-2, at 107:24-108:2; ECF No. 51-15.) Mr. Dasrath did not comply. He allegedly said something to Officer Guzman; Officer Ermann testified that the decedent was yelling unintelligibly, while Officer Guzman testified that the decedent said, "You want to fight?" (ECF No. 51-1, at 138:21-139:12; ECF No. 51-2, at 112:3-

---

[6] According to Officer Guzman, the effective range of mace is "around five feet," and the effective range of a fully extended baton is around "two feet." (ECF No. 51-2, at 49:19-50:2.) Although both officers had mace and expandable batons, they claim "it was too great [] a risk" to use these weapons due to their limited range and the possibility that they would not work on Mr. Dasrath. (Defs.' 56.1, ¶¶ 35-36.)

4

7.) Both officers testified that Mr. Dasrath was holding a knife when he ran at them—testimony corroborated by the statements that two witnesses—Jose Soto and Samuel Martinez—gave to the police. (Defs.' 56.1, ¶ 53; ECF No. 51-14, ECF No. 51-15.) The parties agree that Mr. Dasrath did not touch either officer, and did not injure anyone else in the area. (Pl.'s Rule 56.1, ¶¶ 44, 69.) Officer Guzman "quickly back peddled with his firearm pointed at [Mr. Dasrath's] chest to create a safe distance between himself and [the] decedent," and then fired one shot at Mr. Dasrath's chest. (*Id.* ¶¶ 54-61.) Officer Guzman saw Mr. Dasrath grimace; he paused for one or two seconds to see if Mr. Dasrath stopped. (ECF No. 51-2, at 134:4-135:19.) When Mr. Dasrath continued coming at him, he fired four more shots at him. (Defs.' 56.1, ¶¶ 61-65.) Before he fired the final shot, Officer Guzman saw Mr. Dasrath bring his left hand—in which he held the knife—close to his chest. (ECF No. 51-2, 134:4-141:19; 145:17-146:22; 184:18-185:7.) Mr. Dasrath fell face down on the ground. (Pl.'s 56.1 ¶ 71; ECF No. 51-2, 168:23-24.) He sustained gunshot wounds to his upper right chest, right flank, abdomen, and left clavicular region. (Pl.'s 56.1 ¶ 65; ECF No. 55-5.) Officer Ermann did not fire his gun. (Pl.'s 56.1 ¶ 58.) Officer Ermann handcuffed Mr. Dasrath, and Officer Guzman used his foot to drag the knife from Mr. Dasrath's hand. (*Id.* ¶ 75.) Mr. Dasrath was taken to the hospital and pronounced dead at 3:45 p.m.[7] (*Id.* ¶¶ 77-82.)

The plaintiff admits that Mr. Dasrath had a knife and was moving towards Officer Guzman. However, the plaintiff argues that Mr. Dasrath did not pose an imminent threat to the public or the officers when Officer Guzman shot him, and cites Officer Ermann's testimony that there were "no civilians in the immediate vicinity," as well the officer's testimony that the decedent posed "no imminent threat" to him because he was standing in the street behind cars.

---

[7] The record reflects that Officer Ermann radioed that shots had been fired at 3:01 p.m. (ECF No. 51-3.)

(ECF No. 51-1, 135:25-136:5, 153:15-20.) The plaintiff says that Mr. Dasrath was not a threat to Officer Guzman because the officer was "constantly back-pedaling" away from him. (ECF No. 51-2, at 126:25-128:7.) He also cites Samuel Martinez's estimate in a police report, that Mr. Dasrath was 30 feet from the decedent when the officer fired the first shot. (ECF No. 51-15 (the "male white police officer shot one time when the large male was about 30 feet away from him [and then shot him again when the decedent] was 20 feet from him).)

The parties disagree about the speed at which Mr. Dasrath was moving towards Officer Guzman. The plaintiff—Mr. Dasrath's father—maintains that Mr. Dasrath was "very heavy," could "hardly [] walk," and that he could not "move fast." (ECF No. 51-4, 95:16-20.) He also relies on Jose Soto's police statement that Mr. Dasrath fell about 15 feet from the officers, which the plaintiff asserts undermine the officers' recollection that Mr. Dasrath fell one to three feet away from Officer Guzman.[8] (ECF No. 51-14 (Soto's statement to the police that the decedent "was approximately 5 yards away from the officers when he finally went down."); ECF No. 51-1, 155:25-156:3.)[9]

The parties also disagree about the conclusions to be drawn from the facts. The plaintiff contends that the officers should have deduced from the decedent's "erratic" behavior during this

---

[8] The defendants rely on two surveillance videos for the proposition that the decedent ran toward the officers. (ECF No. 51-6; ECF No. 52, at 18.) "[T]he mere existence of a videotape in the record depicting some or all of the events in dispute will not *always* be dispositive at the summary judgment stage." *Hulett v. City of Syracuse*, 253 F.Supp.3d 462, 482 (N.D.N.Y. 2017) (collecting cases) (emphasis in original). I have reviewed the surveillance videos, and they are inconclusive. The videos, apparently taken from across the street, do not capture the entire encounter, and what they do show is indistinct; while it is possible to discern the two officers and to see that one of them takes a defensive stance—apparently in reaction to an approaching figure—it is impossible to determine what that person is doing, especially since a passing truck blocks it from view. Thus, "the appropriate course of action is still to permit the jury an opportunity to 'resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes in which juries engage: evaluating credibility, drawing inferences from everything they ha[ve] seen and heard, and deciding what all the evidence 'means' and what it reveals about what happened." *Id.* (quotations and citations omitted); *accord Fana v. City of New York*, No. 15 CIV. 8114 (PGG), 2018 WL 1581680, at *11 (S.D.N.Y. Mar. 27, 2018).

[9] Mr. Soto also told the police that "if the officer[] didn't shoot[,] [the decedent] would have killed him." (ECF No. 51-14.)

very brief encounter that the decedent was an Emotionally Disturbed Person ("EDP"). Thus, the plaintiff maintains, the officers should have considered the recommendations in the Patrol Guide and the Police Student's Guide, including requesting Emergency Service Unit assistance and communicating with supervisors about how to approach the decedent. (Pl.'s 56.1 ¶ 37.)[10] The defendants respond that the situation was "fast-moving," and they did not have time to assess whether the decedent was an EDP.[11] (ECF No. 51-1, at 109:24-114:22; ECF No. 51-2, at 171:9-25, 176:1-25.)

Finally, the plaintiff argues that Officer Guzman's use of force was unreasonable because Mr. Dasrath no longer posed a threat when the officer fired the fifth shot. Officer Guzman testified that the decedent posed an imminent threat throughout the entire incident, and that he fired four additional times at the decedent because the decedent "didn't break stride" after the first shot, that he "continued to advance, actually closing ground" on the officer, and that the decedent did not fall to the ground until after the fifth shot. (ECF No. 51-2, 128:19-25; 184:18-25). The plaintiff cites the medical examiner's report of the downward trajectories of the bullet wounds, which might suggest that the decedent was falling forward after the first shot. (ECF No. 55-5.) He also points to Maurice Moctezuma's statement to the police that the "male [went]

---

[10] The plaintiff cites the Patrol Guide and Police Student Guide at various points in his brief and in his 56.1 Statement. As their titles suggest, these sources are guides. The procedures outlined in them do not apply to all circumstances, and certainly do not establish constitutional standards. *See Galapo v. City of New York*, 95 N.Y.2d 568, 575 (2000) ("The Patrol Guide is an internal manual . . . containing thousands of rules, procedures and policies adopted by the Police Commissioner for the governance, discipline, administration and guidance of the Police Department . . . . It is not a body of law or regulation establishing clear legal duties that should serve as a basis for civil liability of municipalities . . . . Significantly, though some of its provisions are couched in mandatory terms, the Patrol Guide does not prescribe the specific action to be taken in each situation encountered by individual officers, but rather is intended to serve as a guide for members of the Police Department."); *See also Johnson v. City of New York*, No. 15-CV-1625 (SMG), 2017 WL 1476139, at *8 (E.D.N.Y. Apr. 24, 2017) ("Even if the NYPD Patrol Guide requires a step that [an officer] failed to take, that failure would not call into question the existence of probable cause or rise to the level of a violation of a constitutionally protected right."); *Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *6 (S.D.N.Y. Jan. 31, 2017) (same).

[11] The shooting appears to have occurred approximately seven minutes after Mr. Zhan's call to 911. (ECF No. 51-3.)

down" after the officer fired "three times." (ECF No. 51-13.) Finally, the plaintiff says that Officer Guzman could not have reasonably believed that Mr. Dasrath was still attacking him when he fired the fifth shot because he saw Mr. Dasrath bring his left hand—the hand holding the knife—close to his chest after the fourth shot. (ECF No. 51-2, 134:4-141:19; 145:17-146:22.)

2. **Procedural History**

The plaintiff commenced this action on February 13, 2015, and filed a First Amended Complaint on July 17, 2015. (ECF Nos. 1, 13.) The amended complaint alleged an excessive force claim against Officer Guzman, a failure to intervene claim against Officer Ermann, and a claim of municipal liability against the City of New York based on a failure to train. (ECF No. 13.) The plaintiff also asserted claims of assault and battery, conscious pain and suffering, wrongful death, and negligence against the City under the theory of *respondeat superior*. (*Id.*)

On June 12, 2017, the plaintiff voluntarily withdrew the failure to intervene claim against Officer Ermann and the municipal liability claim against the City of New York. (ECF No. 43, n.1.) Accordingly, the only claims remaining in this case are the excessive force claim against Officer Guzman and the state law claims against the City. On October 16, 2017, the defendants moved for summary judgment on all of the remaining claims. (ECF Nos. 50, 52.) The parties completed initial briefing on the motion on December 8, 2017, and submitted supplemental briefing following the Supreme Court's decision in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018).

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, in the form of deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R.

8

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the "burden of showing the absence of any genuine dispute as to a material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 446, 453–54 (S.D.N.Y. 2012) ("While disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted.") (quoting *Anderson*, 477 U.S. at 248). "Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998). In deciding whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008). Because the defendants are moving for summary judgment, I draw all reasonable inferences in the plaintiff's favor.

## DISCUSSION

The defendants argue that they are entitled to summary judgment on the excessive force, assault and battery, and wrongful death claims because Officer Guzman's use of deadly force was objectively reasonable in light of the facts and circumstances of the case, and that in any event, Officer Guzman is entitled to qualified immunity. The defendants also move to dismiss

9

the state law claims on various grounds, including that the defendants are entitled to governmental immunity. For the reasons discussed below, the defendants' motion for summary judgment is denied on the excessive force, assault and battery, conscious pain and suffering, and wrongful death claims. The defendants' motion on the negligence claim is granted.

### A. Section 1983 Excessive Force Claim

#### a. *Excessive Force*

Claims that law enforcement officers have used excessive force are analyzed under the Fourth Amendment's objective standard of reasonableness. *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) ("Under the Fourth Amendment, which governs the use of force in connection with an arrest, law enforcement officers may use only such force as is objectively reasonable under the circumstances."). In determining whether an officer's use of force is reasonable, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether the suspect [was] actively resisting arrest or attempting to evade arrest by flight." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996) (quoting *Graham*, 490 U.S. at 396). The evaluation must take into account unpredictable and often risky nature of police work. "The calculus of reasonableness must [also] embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *O'Bert*, 331 F.3d at 36.

An officer's use of deadly force against a suspect is not objectively reasonable "unless the officer has probable cause to believe that the suspect poses a significant threat of death or

serious physical injury to the officer or others." *O'Bert*, 331 F.3d at 36; *accord Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 762 (2d Cir. 2003) (internal quotation marks and citation omitted). "The threat must be immediate." *Woodward v. Town of Brattleboro*, 148 F. App'x 13, 14 (2d Cir. 2005) (summary order). A determination of reasonableness is fact-specific, and "'depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force.'" *Salim,* 93 F.3d at 92; *accord Jamison v. Metz*, 541 F. App'x 15, 19 (2d Cir. 2013) (summary order).

When the claimed excessive force results in a civilian's death, the court must take special care in evaluating the evidence, because often "the witness most likely to contradict the police officer's story . . . is unable to testify;" accordingly, the court cannot "simply accept what may be a self-serving account by the officer." *O'Bert*, 331 F.3d at 37 (quotation marks and citation omitted). The court must also consider any circumstantial evidence that "would tend to discredit the officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.*

Lawsuits involving encounters between citizens and police officers are, by their very nature, almost entirely dependent on the facts. This case is no exception, and in my view, the factual disputes preclude resolution at this stage of the litigation. The defendants base their summary judgment argument on the following facts: that the decedent had a knife in his hand, that he charged at the patrol car with the knife in his hand, that the driver of the car, whose window was down, had to move the car to get away from the decedent, that the decedent refused to comply with multiple commands to drop the knife when they approached him, and that the decedent ran at Officer Guzman with the knife in his raised hand. The defendants say that the totality of these facts establish that the decedent was an immediate threat to himself and to others

11

and that it was objectively reasonable for Officer Guzman to use deadly force. (ECF No. 52, at 9-10.)

The plaintiff denies that the decedent had a knife when the officers first arrived, or that he charged the patrol car.[12] While the decedent had a knife during the second encounter with the officers, the plaintiff says that a jury could reasonably find that he did not pose an immediate threat to anyone's safety, and that Officer Guzman's use of deadly force was excessive. Under the plaintiff's version of the facts, the decedent was holding a knife with a three-inch blade, and standing as far as 30 feet away when Officer Guzman fired the first shot. Officer Guzman was wearing his Kevlar vest, had his pepper spray and an expandable baton, and was back-pedaling from the decedent, who was moving slowly. There were no civilians in the immediate vicinity. Moreover, Officer Ermann did not fire his gun because he did not think that the decedent posed an "imminent threat" to him. (ECF No. 51-1, at 135:25-136:5.) Thus, viewing the facts in the light most favorable to the plaintiff, a jury could find that the decedent was not an immediate threat to the public or to the officers, and that Officer Guzman's use of lethal force was unreasonable.[13]

In my view, the plaintiff has also raised a triable issue of material fact about whether Officer Guzman was justified in firing as many shots as he did: in other words, whether the

---

[12] The parties agree that the decedent threw a glass at the patrol car and Mr. Maldonado's cab, which did not constitute an immediate threat.

[13] To the extent that the plaintiff bases his excessive force claim on violations of police procedure for dealing with an EDP, that argument fails as a matter of law. The Second Circuit has made it clear that an officer's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force." *Salim*, 93 F.3d at 92 ("The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force," and evidence that the officers created the need to use deadly force, such as failure to call for back-up, is irrelevant to the objective reasonableness of his conduct at the time he decided to employ deadly force). *See also Elias v. Vill. of Spring Valley*, 81 F. Supp. 3d 312, 320 (S.D.N.Y. 2015) ("While plaintiff is likely correct that [the officer] should have waited for other officers to arrive [because the use of deadly force may not have been necessary had he waited], it is, at least in this case, irrelevant to an assessment of Fourth Amendment reasonableness . . . .").

officer continued to fire after the decedent was no longer a threat to the officers. The plaintiff claims that even if the decedent posed an imminent threat at the moment of the shooting, he was severely wounded after the first shot and falling to the ground. Thus, the plaintiff claims, it would have been objectively unreasonable for Officer Guzman to continue shooting at the decedent. The plaintiff also argues that it was objectively unreasonable for Officer Guzman to fire the final shot, because it is undisputed that at that point, he saw the decedent bring the knife to his own chest. Viewing these facts in the light most favorable to the plaintiff, a jury could reasonably conclude that the decedent, at some point, was no longer a threat to Officer Guzman, and that the officer's decision to continue shooting at the decedent constituted excessive force. *See, e.g., Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *5 (S.D.N.Y. Jan. 31, 2017) (denying summary judgment on excessive force claim and qualified immunity defense because there are material issues of fact as to whether the final shot that killed the decedent was fired while he was lying wounded on the ground and no longer posed a threat); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 437-38 (S.D.N.Y. 2015) (denying summary judgment on claim of excessive force against one of the defendants because there were triable issues of fact as to whether he was justified in his final use of force); *cf. Alvarez v. City of New York*, No. 11-CV-5464 (JPO), 2017 WL 1506563, at *4-5 (S.D.N.Y. Apr. 27, 2017), *on reconsideration in part*, No. 11-CV-5464 (JPO), 2017 WL 6033425 (S.D.N.Y. Dec. 5, 2017) (denying qualified immunity where jury found that the defendants continued to shoot at the petitioner after it was no longer reasonable to believe that the plaintiff posed a significant threat of death or serious physical harm). Summary judgment is therefore inappropriate on the excessive force claim.

    b. *Qualified Immunity*

The defendants argue that even if there were a constitutional violation, Officer Guzman is entitled to qualified immunity pursuant to *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) because his conduct did not violate clearly established law, and because "it cannot be said that a reasonable officer would have known he was violating the Fourth Amendment by using deadly force under these circumstances." (Defs.' Suppl. Mem., ECF No. 59, at 6.) This is a very close question but in my judgment, it cannot be resolved at this stage of the litigation.

"The qualified immunity doctrine focuses on whether the federal constitutional or statutory right that the plaintiff claims the officer violated 'was clearly established at the time of the challenged conduct.'" *Bah v. City of New York*, 319 F. Supp. 3d 698, 709 (S.D.N.Y. 2018) (citing *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 255 (2d Cir. 2014)). A "[g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Abrams*, 764 F.3d 244 at 255. Although it is "not require[d] [for] a case [to be] directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255 (2015)). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force,' and give an officer notice that a specific use of force is unlawful;" however, "general statements of the law are not inherently capable of giving fair and clear warning to officers" in "obvious cases." *Id.*; *see Bah*, 319 F. Supp. 3d at 710. Moreover, the officer's actions are assessed in

view of the clearly established law at the time the officer acted. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

In *Bah v. City of New York*, 2017 WL 435823 (S.D.N.Y. Jan. 31, 2017), an excessive force case also involving an emotionally disturbed man who had a knife when the defendant officers encountered him, the court denied summary judgment because there were material facts in dispute as to whether the final shot to the head that killed Bah was fired at close range while Bah was lying wounded on the ground. *Bah*, 2017 WL 435823, at *5. The court explained that if the jury believed the plaintiff's version—that Bah was no longer attacking the officers with a knife and posed no threat to the officers or anyone else when he was shot—the shooting "would violate [the] clearly established right" in *O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003): that "'[t]he earlier threat [with a knife] did not give [the officer] license to shoot to kill a man he knew, immediately before and at the moment of the shooting, was unarmed.'" *Id.*

Likewise, because there are disputed material facts as to whether Officer Guzman shot the decedent after he was severely wounded and no longer posed a threat to the officers or anyone else, I cannot grant qualified immunity at this time. "The dispositive legal point is that a grant of qualified immunity as to the use of force—even lethal force—in the course of an event does not necessarily extend to all use of such force throughout the incident." *Estate of Jaquez*, 104 F. Supp. 3d at 437-38. According to the plaintiff, the decedent fell and stopped posing a threat to the officers as early as after the first shot, and no later than after the fourth shot. If the jury finds that Officer Guzman continued to shoot the decedent when he was incapacitated and no longer a threat, then the officer's actions would violate the clearly established right in *O'Bert*. *See O'Bert*, 331 F.3d at 39-40; *accord Bah*, 319 F. Supp. 3d at 710-11; *Estate of Jacquez*, 104 F. Supp. 3d at 437-38 (denying summary judgment as to one of the defendants where there are

15

material issues of fact as to whether he fired the final bullet while the decedent was severely wounded and on the ground) (citing *O'Bert*, 331 F.3d at 40).[14] Because a jury could reasonably conclude that the officer violated clearly established law at some point in the encounter, the defendants' motion for summary judgment on the qualified immunity defense is denied. *See, e.g., Alvarez*, 2017 WL 1506563, at *1 (denying qualified immunity where the jury found that the defendants used both unjustified and justified force against the plaintiff); *Bah v. City of New York*, 319 F. Supp. 3d at 710-12.

### B. State-Law Claims

#### a. Negligence

The defendants' motion for summary judgment on the plaintiff's negligence claim is granted. "When a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Bah*, 2017 WL 435823, at *4 (dismissing the plaintiff's negligence claim, which was also based on the officers' alleged lack of care in handling an EDP, for this reason) (citing *Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002); *accord City of New Rochelle*, No. 13CV7432 (LMS), 2017 WL 1402122, at *30 (S.D.N.Y. Apr. 3, 2017); *Rafter v. Bank of Am.*,

---

[14] *Kisela* does not change this analysis. The *Bah* case proceeded to trial and the plaintiff prevailed on the excessive force claim against one of the detectives. *Bah*, 319 F. Supp. 3d at 701, 707. On May 21, 2018, after *Kisela* was decided, the *Bah* court denied the defendants' post-trial motion for qualified immunity. *Id.* at 712. The court noted that the version of events that the jury believed—that the detective shot Bah while he was incapacitated and on the ground—was reasonable. *Id.* at 708. Moreover, the court ruled that while *Kisela* cautioned "'clearly established law' should not be defined at a high level of generality," this version of the events presented an "obvious" case for denying qualified immunity. *Id.* at 710-712. The court reasoned that under *O'Bert*, "the fact that the person may have engaged in some form of threatening conduct in the moments before the shooting would not justify shooting him after he ceased posing a threat." *Id.* The defendants do not cite any relevant cases to the contrary. (*See* ECF No. 59, at 6.) *See Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established.") (citing *Townes v. City of N.Y.*, 176 F.3d 138, 144 (2d Cir. 1999)). In fact, in a case the defendants cite, *Routier v. O'Hara*, No. 08-CV-02666 CBA LB, 2013 WL 3777100 (E.D.N.Y. July 17, 2013), the district court denied qualified immunity because there were material issues of fact as to whether the officers continued to use force even after the plaintiff was already subdued. 2013 WL 3777100, at 9-13.

No. 04 CIV. 3341 JSRKNF, 2009 WL 691929, at *10 (S.D.N.Y. Mar. 12, 2009), *aff'd*, 523 F. App'x 79 (2d Cir. 2013).

The plaintiff's attempt to cast his claim as negligence—that the officers acted negligently before the shooting—is not convincing. "[R]egardless of what led to the circumstances in which force was used on [the decedent] . . . the use of force against him were intentional acts by the officers;" accordingly, the plaintiff's negligence claim fails as a matter of law.[15] *Bah*, 2017 WL 435823, at *4.

### b. *Remaining State Law Claims*

The defendants contend that the remaining assault and battery, wrongful death, and conscious pain and suffering claims should be dismissed for the same reason as the excessive force claim: that the force used against the decedent was reasonable, and justified. However, because there are genuine issues of material fact that preclude summary judgment on the excessive force claim, the defendants' motion for summary judgment on the assault and battery,[16] wrongful death,[17] and conscious pain and suffering claims is also denied. *See, e.g.*,

---

[15] To the extent that the plaintiffs assert a separate claim of negligent hiring, training, and supervision against the City (ECF No. 1, at ¶ 59), that claim also fails as a matter of law. This claim could only "proceed against an employer for an employee acting outside the scope of her employment," and the plaintiff has already conceded that the defendant officers were "acting within the scope of their employment." (ECF No. 1, at ¶¶ 55-58). *Gurevich v. City of New York*, No. 06 CIV. 1646 (GEL), 2008 WL 113775, at *6 (S.D.N.Y. Jan. 10, 2008); *see also Cerbelli v. City of New York*, No. 99-CV-6846 ARR RML, 2008 WL 4449634, at *24 (E.D.N.Y. Oct. 1, 2008).

[16] The defendants argue that the assault claim should be dismissed because the decedent refused to obey numerous orders to drop the knife, and thus, there is no evidence that the decedent "apprehended any harm or imminent threat from [the] defendants' actions prior to his shooting." (ECF No. 52, at 24-25.) Just because the decedent did not drop his knife does not mean that he was not fearful. Two officers approached the decedent with their guns drawn, and shouted at him. According to the defendants, the decedent yelled, "You want to fight?" Under the circumstances of this case, a jury could reasonably find that the decedent apprehended harm or imminent danger prior to his shooting. *See, e.g., Cerbelli*, 2008 WL 4449634, at *21 ("Whether [the plaintiff] apprehended harm or imminent danger from police officer defendants' actions is thus a question of fact for a jury to resolve.); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 399 n. 24 (S.D.N.Y. 2013) (facts indicating that the plaintiff was well aware that officers were attempting to enter his apartment and had their guns drawn plausibly alleged an assault claim).

[17] I also reject the defendants' argument that there is no evidence that the decedent's distributees (his father or mother) suffered a pecuniary loss by reason of the decedent's death. (ECF No. 52, at 21.) The plaintiff—the decedent's father—submitted receipts funeral expenses, and testified that he would be responsible for paying these expenses if he had the money. (ECF Nos. 55-16, 55-17, 55-18, at 65:21-66:3.) Thus, the plaintiff has presented

*Bah*, 2017 WL 435823, at *4 (denying summary judgment to excessive force and state law claims); *Estate of Jaquez*, 104 F. Supp. 3d at 440 (same standard applies to Fourth Amendment excessive force claims and assault and battery claims).

For the same reason, I also decline to grant governmental immunity on the state law claims at this time. *See, e.g.*, *Cerbelli*, 2008 WL 4449634, at *21-22 (denying summary judgment on governmental immunity against officers Valdes and Ehmer where there are remaining issues of fact as to reasonableness of their actions); *Tatum v. City of New York*, No. 06CV.4290(BSJ)(GWG), 2009 WL 124881, at *12 (S.D.N.Y. Jan. 20, 2009) (same).

## CONCLUSION

For the reasons explained, the defendants' motion for summary judgment [50] is granted with respect to the plaintiff's negligence claim. The defendants' motion for summary judgment on the excessive force, assault and battery, conscious pain and suffering, and wrongful death claims is denied.

**SO ORDERED.**

                                                  s/Ann M. Donnelly

                                                  Ann M. Donnelly
                                                  United States District Judge

Dated: Brooklyn, New York
        September 25, 2018

---

sufficient evidence of a pecuniary loss to survive summary judgment on the wrongful death claim. *See* N.Y. Est. Powers & Trusts Law § 5–4.3 (McKinney) (Damages recoverable for wrongful death are limited to "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought," and includes "the reasonable expenses of medical aid, nursing and attention incident to the injury causing death and the reasonable funeral expenses of the decedent paid by the distributees, or for the payment of which any distributee is responsible.").